## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BECKLEY DIVISION

CARLA D.,

      Plaintiff,

v.                              CIVIL ACTION NO. 5:22-cv-575

MARTIN J. O'MALLEY
Commissioner of Social Security,[1]

      Defendant.

### PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Carla D. ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for a Period of Disability and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. By standing order, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 4.) Presently pending before this Court are Claimant's Brief – Social Security (ECF No. 10), and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 13). Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District

---

[1] Commissioner O'Malley was substituted in place of Acting Commissioner Kilolo Kijakazi following O'Malley's appointment on December 20, 2023.

Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 10),
**GRANT** the Commissioner's request to affirm his decision (ECF No. 13), **AFFIRM** the
final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was classified as a person of "advanced age" (age 55+) at the time of her
alleged disability onset date, and she subsequently became "closely approaching
retirement age" (age 60+) on the date of the decision by the Administrative Law Judge
("ALJ"). She has a high school education and past relevant work as a dental technician
and dental assistant Tr. 28, 530 .[2]

Claimant alleges that she became disabled on October 31, 2018, due to fibroid
tumors on both feet as well as knee problems Tr. 65-66 . She filed her application for
benefits on January 17, 2020. Tr. 15 . Her claim was initially denied on August 10, 2020,
and again upon reconsideration on October 21, 2020 Tr. 79, 94 . Thereafter, on December
7, 2020, Claimant filed a written request for hearing Tr. 116 . An administrative hearing
was held by telephone before ALJ M. Drew Crislip on February 9, 2022 Tr. 35-64 . On
March 30, 2022, the ALJ entered an unfavorable decision Tr. 15-29 . Claimant then
sought review of the ALJ's decision by the Appeals Council on that same date. Tr. 195.
The Appeals Council subsequently denied Claimant's request for review on October 25,
2022, and the ALJ's decision became the final decision of the Commissioner on that date
Tr. 1-6 .

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 7.

Claimant timely brought the present action on December 13, 2022, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g) (ECF No. 2). The Commissioner filed a transcript of the administrative proceedings on February 9, 2023 (ECF No. 8). Claimant subsequently filed her Brief – Social Security (ECF No. 10) on Apprril 23, 2023, and the Commissioner file his Brief in Support of Defendant's Decision (ECF No. 13) on May 24, 2023. Claimant then filed her Reply Brief on June 7, 2023 (ECF No. 14). As such, this matter is fully briefed and ripe for adjudication.

### B. Relevant Medical Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes the relevant portions here for the convenience of the United States District Judge.

### 1. Treatment Records

In October 2018, Claimant underwent a plantar fasciectomy, which involved a resection of three left foot plantar fibromas—a soft tissue mass—from the bottom of her left foot Tr. 357-363). She subsequently received physical therapy for plantar fascial fibromatosis Tr. 314 . A few months later in May 2019, an x-ray image of the left foot revealed a "small inferior calcaneal spur and pes planus," but there was no evidence of fracture or dislocation Tr. 348 . An MRI of Claimant's left foot demonstrated a stress fracture of the proximal second metatarsal bone, and there was thickening and scarring along the plantar fascia that was noted to be related to her October 2018 surgery Tr. 343-344 . Claimant was treated with a cam boot Tr. 440 .

On October 1, 2019, Claimant's provider Blake Austin Weeks, D.P.M., indicated that Claimant was "much improved" and she could transfer out of the cam boot Tr. 441 . On examination, Dr. Weeks noted pain along the left second metatarsal bone;

however, Claimant's left foot pain on palpation of the left plantar fibroma resection site had improved, and Claimant ambulated with a normal gait Tr. 440 .

In April 2020, Claimant was prescribed custom orthotics due to bilateral plantar fibroma,  plantar fasciitis, and bilateral metatarsalgia; she was also prescribed a rolling walker Tr. 418-19 . Four weeks later on May 13, 2020, Claimant followed up with her treating podiatrist, Stefan Lorincz, D.P.M. Id. Claimant reported that she was doing "significantly better" after Dr. Lorincz had prescribed Meloxicam Tr. 420 . She reported being able to "get around" for approximately 20 minutes at a time with the use of the walker without being in severe pain; she did, however, report having shooting pains, especially at night, in the bottom of her feet and toes Tr. 420 . On examination, Dr. Lorincz noted a "nodularity of the right plantar fascia" Tr. 420-421 . There was some improvement in her foot pain, however, as Dr. Lorincz noted that with palpation of the plantar surface of both feet there was a decrease in pain especially on the left foot along the previous surgical incision Tr. 421 .  Dr. Lorincz concluded that Claimant had "good improvement." Id. His treatment plan called for a new prescription for Gabapentin, as Dr. Lorincz stated he believed it would "improve her symptoms more" Id. Additionally, he instructed Claimant to continue with her use of the prescribed walked, and to wear appropriate shoes; he noted that she "will benefit from the orthotics as well." Id. He released Claimant to follow up as needed.

On January 21, 2021, Claimant presented to Charleston Area Medical Center remotely via telehealth communication for a neurology consult and review of her brain MRI Tr. 811 . Claimant was referred by her primary-care provider after reporting recurring migraines with associated aura, night terrors, and memory difficulties Tr. 817 . The neurologist discussed the results of Claimant's MRI, and informed her that there were no acute findings or changes Tr. 811 . The neurologist noted in the treatment records that she spent more than half of the appointment time "counseling related to

4

importance of routine daily lifestyle to prevent migraine, importance of timing of migraine treatment, how to avoid medication overuse headache, medication profile, instructions, and possible side effects" Tr. 811 . Claimant reported to the neurologist that her symptoms had improved since the MRI was taken. Id.  Her headaches decreased to about twice per week. Id. Additionally, she reported that her night terrors were "not as frightening as they were and not as frequent." Id. She denied any side effects from her Amitriptyline medication, and the neurologist discussed increasing the dosage slightly if her migraine and night terrors persisted. Id. She did report that her memory problems persisted, and the neurologist suggested that Claimant "may want to be tested by an ADHD specialist." Id.

In March 2021, Claimant was referred to John Bowyer, M.A., at Access Behavioral Health, for an evaluation of possible attention deficit hyperactivity disorder (ADHD). On mental status evaluation, she could recall events from the past and she could recall two of three objects after approximately 20 minutes; with verbal cueing, she could recall three of three objects; she did serial sevens one-step without error before stating that she could not calculate further; she spelled WORLD backward without error and was able to repeat seven digits forward and four digits backward. Mr. Bowyer noted, however, that Claimant had deficits in working memory. Tr. 784.  Nonetheless, Bowyer found that Claimant's immediate, recent, and remote memories were intact. Id. He diagnosed recurrent major depressive disorder; generalized anxiety disorder; and ADHD, predominantly inattentive type Tr. 785 . She was noted to be forgetful, had difficulty concentrating demonstrated by word-finding pauses, and confusion, as a result of her frequent anxiety and recurrent depressive episodes Tr. 784 . The exam showed depressed mood, recall of only 2/3 objects after 20 minutes, and deficits in recall, attention, and concentration. Id. She was flustered and tearful during one portion of the testing process.  Id.

On May 28, 2021, Claimant presented to her primary-care provider for a routine follow-up on her chronic medical conditions Tr. 787 . A lengthy medical history was taken during this visit. Claimant reported a history of hyperlipidemia, hypertension, diabetes mellitus, neuropathy, gastroesophageal reflux disease ("GERD"), trigeminal neuralgia, migraines, anxiety, and depression. Claimant reported that over the years, she had been prescribed various antidepressants by her primary care providers Tr. 787-795 . At one point while living in Winston-Salem, North Carolina, she was under the care of a psychiatrist who prescribed an antidepressant. She has seen multiple therapists. Id. When Claimant was around 30 years old, she was admitted to a psychiatric facility after she stabbed herself in the arm with a wood working tool. Id. Claimant explained that the incident occurred during an altercation with her husband at the time. She was adamant that the incident did not represent a suicide attempt, and she denied a history of suicide attempts. Claimant reported that she was last under the care of a psychotherapist approximately six years ago. Her primary care physician at the time had prescribed sertraline, and Claimant reported that this medication was helpful in addressing her anxiety-related and depressive symptoms. Id.

On examination, Claimant reported that she "has been doing well at this time," with no new complaints Tr. 792 . She had a healthy appearance and was noted to be in no acute distress, with normal mood and affect and oriented to time and place. Her recent memory and her remote memory were normal. She had normal motor strength, and normal movement of all extremities with no cyanosis, edema, or varicosities. Tr. 793 . Claimant reported that her physical complaints included muscle aches, arthralgias/joint pain, and back pain. As to her mental-health status, Claimant reported depression and anxiety with some fatigue, but denied any suicidal ideation or thoughts of self-harm  Tr. 792 .

Reviewing her current medications, Claimant reported that she was taking naproxen as needed for joint pains, which was "working well," and her diabetes, hypertension, cholesterolemia, and GERD symptoms were all well controlled on medication. Additionally, Claimant reported that she was taking the tricyclic antidepressant amitriptyline for neuropathy and insomnia, as well as the Zoloft medication that was prescribed for her anxiety disorder which she reported was "working well." Tr. 792-793 . She reported that she was tolerating all of her medications well, and requested refills. Id. However, Claimant did report that she was continuing to have problems with migraines and she requested a prescription for imitrex, as it had worked for her "in the past." Id. She explained that she followed with neurology, but was awaiting insurance approval for an MRI of the brain. Id. Finally, she reported that she "has had multiple treatments for her unspecified polyneuropathy and foot pain and did not tolerate them" Tr. 794 .

This appointment was representative of Claimant's treatment for her anxiety; subsequent treatment notes from 2021 show that her anxiety was well controlled with medication. See Tr. 550, 556, 564, 596, 668, 674, 682, 729, 738, 771. Overall, Claimant largely had normal mental status examinations, with a normal mood and affect and virtually zero mental-health complaints. See Tr. 509, 513, 517, 523, 526, 531, 550, 556, 564, 592, 596, 668, 674, 682, 729, 738, 771, 793, 852, 862.

In December 2021, Claimant presented for a neuropsychological evaluation. Tr. 850-55. She had difficulty with attention and concentration, and difficulty recalling why she entered a room and what she intended to say, occasionally calling her daughter by the wrong name. Tr. 850. She has a history of physical/emotional abuse and nightmares related to childhood trauma. Tr. 852. Exam revealed that her judgment and reasoning for everyday problems was impaired. Tr. 853. Testing also reflected fluctuating task engagement. Tr. 854. Her acquisition of narrative information presented in two brief

stories was below average and she recalled many of the details out of sequence.  Id.  Test scores were within the valid range and showed that her performance is reflective of variability, so Dr. Keener ruled out a neurocognitive disorder per se.  Tr. 853-55. However, he opined that contributing factors include longstanding difficulties with attention/metacognition exacerbated by elevated emotional distress, fatigue, and trauma-related symptoms. Tr. 855.

### 2.  Opinion Evidence and Hearing Testimony

On July 17, 2020, Claimant presented to Katherine Marshall, M.S., for a psychological consultative evaluation Tr. 528-533 . Claimant reported depression, being afraid of people and experiencing recurring nightmares Tr. 529 . Her mental status exam revealed mildly deficient remote memory Tr. 531 . She reported a history of outpatient counseling but denied receiving any outpatient psychiatric treatment such as medications Tr. 529 . On mental status evaluation, her thought processes were understandable and connected Tr. 531 . There was no evidence of delusions, paranoia, obsessive thoughts, compulsive behaviors, or unusual perceptual experiences, and her judgment was within normal limits and insight was good Tr. 531 . Her immediate and recent memory were normal, and her remote memory was mildly deficient. Id. Claimant's concentration was normal, persistence and pace were within normal limits, and social functioning during the evaluation was within normal limits based on clinical observations of social interaction with the examiner and others Tr. 531 .

Also in July 2020, Claimant presented to Jimmy R. Adkins, II, P.A., for a consultative evaluation Tr. 536 . On examination, she ambulated with a limping gait, which was not lurching or unpredictable, although she did not require the use of a handheld assistive device Tr. 538 . Examination of the legs revealed tenderness to palpation of the bilateral feet, but there was no tenderness to palpation of the bilateral ankles; and there was no redness, warmth, swelling, fluid, laxity, or crepitus of the

ankles or feet Tr. 538-39 . She denied any pain with range of motion testing of the lower extremities, muscle strength was normal at 5/5 bilaterally in the upper and lower extremities, and there was no evidence of atrophy Tr. 538-39 . She was unable to distinguish between light touch and vibration in the left foot, but sensory modalities were otherwise well preserved including light touch, pinprick, and vibration; she also had normal reflexes Tr. 539 . Although she complained of pain in the bilateral knees and bilateral feet while squatting, she was able to walk on toes and perform one half squat. Id. Despite limping, Claimant was able to perform tandem gait Tr. 539 . A July 28, 2020 x-ray image of Claimant's left foot demonstrated mild osteoarthritis, a degenerative change, at the hallux metatarsophalangeal joint ("MPJ") Tr. 542 .

The State Agency assessed in August 2020 that Claimant could lift 20 pounds occasionally, 10 pounds frequently; stand/walk 4 hours and sit for 6 hours in an 8-hour workday; occasionally climb ramps/stairs, kneel, crouch, and crawl; never climb ladders/ropes/scaffolds; frequently balance and stoop; and avoid concentrated exposure to extreme cold/heat and vibration; and avoid even moderate exposure to hazards such as machinery and heights Tr. 73-75 . This assessment was reviewed by another evaluator and affirmed in October 2020 Tr. 89-90 .

Claimant testified that she has shooting, throbbing, and dull pain in her left foot and at times it feels like it is being cut. Tr. 51 -52. She needs her walker to walk more than 20 minutes. Tr. 51. She walks on the side of her foot. Id. She has tried acupuncture, custom insoles, and foot injections with little or no effect. Tr. 52-53. In the February 2020 "Function Report," she completed in connection with her initial claim for benefits, Claimant reported that she cannot stand/walk for a long duration of time because of her foot pain. Tr. 239. Additionally, she reported deep and shooting pain in the left foot, and discomfort when wearing shoes for an extended period of time; she stated that sometimes her feet "hurt so bad she walks on the outsides of her feet" Tr. 244. In the

September 2020 Function Report, she again reported only being able to stand/walk for short periods without using a walker, and that even with a walker she still has severe pain in her feet. Tr. 266. When she lifts objects, the extra weight causes additional foot pain. Id. She does not get enough sleep because of pain. Id. Her ability to drive is very limited because of pain in her feet when pressing the pedals. Id. She sits down to dress. Tr. 267.  She only performs household chores for a few minutes before needing to stop and rest her feet.  Tr. 268.  She also completed "Personal Pain Questionnaires" in connection with her claim, reporting pain in her feet. Tr. 232, 274. She described it as aching, stabbing, burning, cramping, and throbbing, and like electric shocks in her left foot. Id. Her pain is worse with standing/walking and wearing shoes for very long. Id. Sometimes the pain is so bad she cries. Id.

In addition to the Claimant, two medical experts and a vocational expert ("VE") offered opinion testimony at the hearing before the ALJ on February 9, 2022 Tr. 35-64 . Agency medical expert Dr. Kweli Amusa testified that Claimant would be able to lift/carry 20 pounds occasionally and 10 pounds frequently, and that Claimant could sit for 6 hours and stand/walk for 2 hours in an 8-hour workday. Tr. 44-45 . Furthermore, Claimant could occasionally operate foot controls with the left leg, and frequently handle and finger bilaterally. However, Dr. Amusa opined that Claimant could have "no exposure to unprotected heights/hazards or extreme cold/vibration" Id.

Next, The ALJ's medical expert, Dr. Jeffrey Fremont, testified that Claimant has diagnoses of depressive disorder, a stressor related disorder, and anxiety, as well as ADHD. Tr. 47 . However, treatment notes indicated that "the anxiety is well controlled on Zoloft." Id. Dr. Fremont opined that Claimant's "thoughts, memory and general functioning in terms of cognition have remained intact," and he did not believe Claimant met or equaled the listing for depression, anxiety or ADHD. Id. Turning to the Listing criteria, he opined that Claimant had mild impairments except for the factors of

concentration, persistence and pace, which he opined would have a moderate limitation. Tr. 48. He opined that it would be more reasonable for her to do simple 1-2 step tasks, and if she was in a situation with excessively high demands with stressful production or time variables, she may decompensate; and there might be some limitation regarding attention. Tr. 48-50. Dr. Fremont stated that he did not believe any other specific work-related limitations were necessary. Id. He explained that he had initially considered anxiety, but treating source records "noted very specifically that the anxiety is well controlled" with her antidepressant medication, and her depression did not interfere with cognition. Id. Additionally, he testified that "there really is no specific clinical evidence for ADHD," because Claimant's attention issues "are mild and secondary to the affective disorders," with only some limitation regarding attention Tr. 50 . Finally, he testified that Claimant would not have any limitations with respect to dealing with the general public. Id.

At the hearing, the VE offered testimony to aid the ALJ's determination regarding Claimant's ability to perform her past relevant work or other work. Based upon the ALJ's hypothetical limitations—reflected in his ultimate RFC determination—the VE testified that an individual with the same age, education and work experience would be able to perform the Claimant's past work Tr. 59 . Additionally, the VE testified that there would be other work in the national economy the individual could perform as well, and provided the representative positions of bagger, laundry bundler, and linen room attendant—all with a "medium" classification Tr. 58 . In response to the ALJ's modification of the hypothetical adding limitations and restrictions, the VE testified that the representative jobs "would still be available" Tr. 59 . However, the VE confirmed that "any other work would not be above the 'light' level of exertion. Id.

Next, the ALJ modified his earlier hypotheticals such that the individual would be restricted from jobs with a high production rate or fast paced work Tr 60 . The VE responded that only the linen room position and Claimant's prior work as a dental technician position would be available. Id. The VE also provided a representative job as a sorter. Id. Finally, the VE testified that if the hypothetical individual were limited to standing and/or walking only two hours per day, that additional limitation would eliminate the past work and that there would not be any transferable skills Tr. 61 .

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Lewis v. Berryhill, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." Preston v. Heckler, 769 F.2d 988, 990 n.* (4th Cir. 1985); see Bird v. Comm'r, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i),

416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. Id. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. See Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); Mascio v. Colvin, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" Radford v. Colvin, 734 F.3d 288, 291 (4th Cir. 2013) (quoting Bowen v. City of New York, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. Mascio, 780 F.3d at 635; see 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." Patterson v. Comm'r, 846 F.3d 656, 659 (4th Cir. 2017); Monroe v. Colvin, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation

marks omitted)); see 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." Lewis, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." Monroe, 826 F.3d at 179 (alterations and internal quotation marks omitted); see 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); see Patterson, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); see id. §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." Patterson, 846 F.3d at 659; see 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." Patterson, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); Monroe, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." Lewis, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" Lewis, 858 F.3d at 862 (quoting Mascio, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations." Id. (quoting Mascio, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled."  Id.

Applying the sequential evaluation process in this case, at step one the ALJ determined that Claimant had not engaged in substantial gainful activity during the relevant time period Tr. 17-18). The ALJ found at step two that Claimant had the severe impairments of osteoarthritis of the left foot with fibrosis and plantar fasciitis, history of stress fracture, and obesity Tr. 18). He also found that her anxiety and depression are "nonsevere" i.e., do not cause more than minimal work-related limitations). Tr. 19-20. Additionally, At step three, the ALJ found Claimant did not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 Tr. 23).

Prior to addressing steps four and five, the ALJ formulated a residual functional capacity (RFC) for a range of light work, finding that Claimant can perform work as follows:

> [Claimant can] lift, carry, push, and pull 20 pounds occasionally, 10 pounds frequently. She is able to sit six hours in an eight-hour workday. She is able to stand and/or walk six hours in an eight-hour workday. She must alternate from sitting to standing or walking for two to three minutes after every hour and from standing or walking to sitting for two to three minutes after every half-hour, always retaining capacity to remain on task during position changes, some of which would be covered by typical work breaks or off task time there beyond. She is limited to occasional operation of foot controls and frequent operation of hand controls. She is limited to frequent reaching in all directions, handling, fingering, and feeling. The claimant is able to stoop frequently. She is able to climb ramps and stairs and balance (navigate uneven or slippery terrain). She should never kneel, crouch, crawl, or climb ladders, ropes, or scaffolds. She should have no exposure to unprotected heights, extreme cold, extreme heat, or vibration. She should have no exposure to noise above the moderate level. The claimant should have no exposure to flashing, glaring, or strobing lights, although typical office fluorescent lights are endurable without restriction. She is limited to frequent operation of a motor vehicle and to frequent work in proximity to moving mechanical parts of dangerous machines. She is limited to occasional exposure to weather, humidity/wetness, and pulmonary irritants. She would be off task 10 percent of the time beyond normal breaks. Due to distractions of physical symptoms, there should be no high production rate or fast paced work.

Tr. 24).

The ALJ found that Claimant can perform light work allowing her to alternate from sitting to standing/walking for 2-3 minutes every hour and from standing/walking to sitting for 2- 3 minutes every half-hour; occasionally operate foot controls; frequently operate hand controls, reach, handle, finger, feel, and stoop; never kneel, crouch, crawl, or climb ladders, ropes, or scaffolds; no exposure to unprotected heights, extreme cold/heat, vibration, noise above the moderate level, or flashing/glaring/strobing lights; frequently operate a motor vehicle and work in proximity to moving mechanical parts of dangerous machines; occasionally be exposed to weather, humidity/wetness, and pulmonary irritants; off task 10% of the time; and due to distractions of physical

symptoms, no high production rate or fast paced work. Tr. 24.  Based on this RFC, the ALJ found that Claimant was able to perform past relevant work as a dental technician, because this work does not require the performance of work-related activities precluded by her RFC. Tr. 28-29). Therefore, the ALJ found Claimant not disabled Tr. 29).

## II.    LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (quoting Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." Id. (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." Id. "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." Johnson, 434 F.3d at 653 (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. Id. (quoting Craig, 76 F.3d at 589).

# III.    ANALYSIS

## A. Mental Limitations

Claimant's first argument asserts that the ALJ failed to provide sufficient analysis to explain why Claimant's non-severe mental impairments were not specifically mentioned in the portion of the ALJ's written decision regarding his RFC determination (ECF No. 10 at 2). The undersigned disagrees.

The specific facts of this case support the ALJ's determination that Claimant did not have a severe mental impairment given her "mild" limitations in the four functional areas and did not require any resultant functional limitations in the RFC Tr. 19-24 . Initially, in finding Claimant's mental impairments to be non-severe (again, which is not disputed by Claimant), the ALJ considered that treatment notes show a history of anxiety and depression; however, on most occasions, Claimant had a normal mood and affect without mental health complaints Tr. 19; see, e.g., Tr. 509, 513, 517, 523, 526, 531, 550, 556, 564, 592, 596, 668, 674, 682, 729, 738, 771, 793, 852, 862 . For instance, as the ALJ noted, in a July 2020 consultative examination, she reported outpatient counseling but denied any outpatient psychiatric treatment such as medications Tr. 19, 529 . On mental status evaluation, thought processes were understandable and connected; there was no evidence of delusions, paranoia, obsessive thoughts, compulsive behaviors, or unusual perceptual experiences; judgment was within normal limits and insight was good; immediate and recent memory were normal; remote memory was only mildly deficient; concentration was normal, persistence was within normal limits, and pace was within normal limits; and social functioning during the evaluation was within normal limits based on clinical observations of social interaction with the examiner and others Tr. 19,

531 . The psychologist evaluator diagnosed unspecified trauma and stressor related disorder Tr. 19, 531 .

The ALJ also considered that in March 2021, Claimant saw John Bowyer for an evaluation of ADHD Tr. 19, 779 . On mental status evaluation, she could recall events from the past and she could recall two of three objects after approximately 20 minutes; with verbal cueing, she could recall three of three objects; she did serial sevens one-step without error before stating that she could not calculate further; she spelled WORLD backward without error and was able to repeat seven digits forward and four digits backward; and, although she had deficits in working memory, immediate, recent, and remote memories were intact, which involve attention and concentration Tr. 19, 784 . In December 2021, as the ALJ noted, Claimant presented to Dr. Keener for a neuropsychological evaluation Tr. 19, 850 . On mental status evaluation, her mood was euthymic, there was no evidence of delusions or hallucinations, and she was pleasant and cooperative during the interview and testing; she demonstrated estimated average intellectual functioning; cognitive testing revealed only mild executive difficulties evidenced by impaired judgment and reduced problem solving, organization, and self-monitoring; and it was noted that performance was more reflective of variability rather than a deficit given intact performances on additional tests measuring executive functioning Tr. 19, 852-54 . Her memory profile reflected generally intact coding, storage/consolidation, and retrieval of novel information, and the psychologist stated her performance was not consistent with a neurocognitive disorder, "as she demonstrated intact areas of cognitive functioning overall" Tr. 19, 854-55 .

After this discussion, the ALJ documented his consideration of Claimant's abilities in the four broad areas of mental functioning (the "B" criteria) , reviewing her subjective

statements, activities, and the examination findings Tr. 20-23 . With respect to understanding, remembering, and applying information, the ALJ found only a mild limitation Tr. 20 . The ALJ considered that on mental status evaluation in July 2020, as noted above, Claimant's immediate memory was normal, based on her ability to instantly recall four out of four words; her recent memory was normal, based on her ability to recall three of four words after a brief delay and an additional word following category prompt; and her remote memory was only mildly deficient based on Claimant's ability to recall details of her personal history Tr. 20, 531 . In March 2021, she was able to recall events from the past, two of three objects after approximately 20 minutes, and with verbal cueing, she could recall three of three objects Tr. 20, 784 . The ALJ noted that although there was some indication of fluctuation in attention and/or task engagement on recognition memory tasks as she tended to make false negative errors for information she freely recalled, the psychologist stated Claimant's performance was not consistent with a neurocognitive disorder, as she demonstrated intact areas of cognitive functioning overall Tr. 20, 853-55 . Moreover, treatment notes from her primary healthcare provider consistently showed normal recent and remote memory Tr. 20, 550, 556, 564, 596, 668, 674, 682, 729, 738, 771, 793 .

The ALJ then found that Claimant had only a mild limitation in interacting with others Tr. 20 . The ALJ pointed to other evidence such as Claimant's report that she was scared of people during a mental status examination in July 2020; in contrast, however, indicated that her social functioning was within normal limits based on clinical observations of social interaction with the examiner and others Tr. 20, 531 . Claimant reported that she went to the store and ran errands a few times per month with her boyfriend and dined out occasionally; she also indicated that she occasionally visited with

family and friends, talked on the phone, sent text messages, had six close friends, and kept medical appointments Tr. 20, 532; see also Tr. 243-44 (indicating that she spends time with others, visits with her daughter and grandkids, and has no problems getting along with family, friends, neighbors, or others)).

The ALJ next determined that Claimant had only a mild limitation in concentrating, persisting, or maintaining pace Tr. 20-21 . The ALJ considered that Claimant's concentration was normal and persistence within normal limits at a mental status evaluation in July 2020 Tr. 20-21, 531 . Additionally, as set forth supra, Claimant's March 2021 evaluation showed Claimant was able to calculate using numbers and able to spell, read, and recall from memory. Tr. 21, 784 . In regard to processing speed, except for impaired performance on a letter-number sequencing tasks, all additional tasks measuring psychomotor speed and non-motor speed were low average to average Tr. 21, 853, 862 .

Finally, the ALJ assessed only a mild limitation in the ability to adapt and manage oneself, noting that Claimant reported that she took her medication, kept scheduled appointments, performed all self-care duties independently, and performed household chores including laundry, dishes, sweeping, and cooking Tr. 21, 532 . Given this evidence, the ALJ concluded that Claimant's mental impairments "cause no more than 'mild' limitation in any of the functional areas," and "the evidence does not otherwise indicate that there is more than a minimal limitation in [Claimant's] ability to do work activities," thus, her mental impairments "are non-severe" Tr. 21 . The ALJ also explained that the mild ratings he made at step two were not an RFC determination Tr. 23, "[t]he limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential

evaluation process."); see also SSR 96-8p, 1996 WL 374184, at *4 (confirming that the limitations identified in the "paragraph B" criteria "are not an RFC assessment"). The ALJ explained that the RFC reflected the degree of limitation assessed in the paragraph "B" analysis and declined to assess any mental limitations in the RFC Tr. 23-24 .

Here, the ALJ was entirely clear that further limitations were not warranted in the RFC Tr. 21-24 . The ALJ explained that he "considered all of the claimant's impairments, including those that are not severe" in assessing the RFC" Tr. 20  (emphasis added . And—more importantly—the ALJ then demonstrated his thought process in reaching that determination based upon specific evidence. Because the ALJ explained his consideration of Claimant's non-severe mental impairments and was entirely clear that RFC limitations were not warranted, remand is inappropriate. See, e.g., Wall, 2:20-CV-00460, 2021 WL 5225792, at *8; Hedrick, 2021 WL 5230735, at *7; Perry, 2016 WL 1183155, at *5.

Claimant's reliance upon Shank v. Saul, No. 3:20-CV-00444, 2021 WL 2767063, at *8–9 (S.D. W. Va. June 11, 2021) (Eifert, M.J.), report and recommendation adopted, 2021 WL 2744550 (S.D. W. Va. July 1, 2021) (Chambers, J.), is not persuasive under the circumstances of this matter. In that case, the ALJ omitted the claimant's mental impairments from the RFC assessment other than to list them among the claimant's allegations at the beginning of the discussion; the Court thus explained that the ALJ did not "provide any insight into why he did not assess any mental RFC restrictions," and, without anything to base his review, it was impossible to determine if the RFC finding was supported by substantial evidence. Id. at *8.

Entirely unlike the Shank case, here, "the ALJ clearly evaluated Claimant's mental functional abilities and articulated why he did not assess any mental RFC limitations." See Hunt v. Kijakazi, 1:21-CV-00265, 2021 WL 9076248, at *9 (S.D. W. Va. Dec. 9, 2021)

(Eifert, M.J.), report and recommendation adopted, CV 1:21-00265, 2022 WL 2719968 (S.D. W. Va. July 13, 2022) (Faber, J.) (distinguishing Shank). For instance, in considering Dr. Fremont's opinion, the ALJ explained that based on distractions of physical symptoms, he eliminated high production rate or fast paced work, but he saw "no justification for limiting this individual to one- to two-step tasks, which would be more indicative of highly-supervised sheltered-workshop type settings" Tr. 21-22 .

On review of the record, the undersigned **FINDS** that the ALJ's determination is supported by substantial evidence. The record repeatedly and consistently showed that Claimant's mental symptoms were well-controlled on medication. While the Court agrees with Claimant that "it cannot be simply assumed that mild mental limitations do not affect a claimant's ability to perform a skilled job" (ECF No. 10 at 8), on review of the record the undersigned **FINDS** that substantial evidence supports the ALJ's determination under the evidence and circumstances of this case. The ALJ pointed accurately to the evidence, and explained why it did not establish that Claimant had any further work-related mental limitations. Claimant has not pointed to any mental functioning evidence that overrides or invalidates the ALJ's conclusions. Without more, Claimant has simply failed to demonstrate reversible error.  See Bowen, 482 U.S. at 146 n.5 (1987).

**B. Total Limiting Effects of Foot Pain**

Claimant's second argument essentially posits that the ALJ relied on objective evidence to the exclusion of "other evidence" such as Claimant's description of her limitations in contravention of 20 C.F.R. § 1529(c) ("We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by your

employers and other persons") (ECF No. 10 at 10). In response, the Commissioner argued that the ALJ's decision is supported by substantial evidence.

To evaluate impairment-related symptoms alleged by an individual, an ALJ must use the two-step process set forth in 20 C.F.R. § 404.1529. SSR 16-3p; 2016 WL 1119029 at *2-3. At the first step, there must be a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms. Id. at *3-4. Once a medically determinable impairment is established, the ALJ evaluates the intensity and persistence of an individual's symptoms and determines the extent to which an individual's symptoms limit the ability to perform work-related activities. Id. at *4-5. In evaluating a claimant's subjective complaints, the ALJ considers the medical record, the Claimant's own statements, statements from treating physicians, and any other relevant record evidence. 20 C.F.R. § 404.1529.

Under governing regulations, once a claimant "has met [the] threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause" the symptoms claimed, the Commissioner's evaluation of the "intensity and persistence" of the claimant's symptoms must "take into account not only the claimant's statements," but also "all of the evidence presented."

Tr. 24). After a careful consideration of the evidence, the ALJ found that Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, Claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medial evidence and other evidence in the record, for the reasons explained in the detailed and extensive written decision Tr. 25.

Moreover, Claimant's reliance upon the Fourth Circuit's recent decision in Arakas v. Comm'r, 983 F.3d 83 (4th Cir. 2020), is inapposite under the circumstances of this case. In Arakas, the ALJ entered a decision that, from the outset, was "plagued by . . . errors." Id. In Arakas, the ALJ found at step two of the sequential evaluation process that the claimant had the severe impairments of fibromyalgia and degenerative disc disease. 983 F.3d at 94. Because the ALJ determined at step three that her impairments did not meet or equal any of the Listings, he assessed the claimant's RFC and found that she retained the ability to perform light work with postural and environmental restrictions. Id. In so finding, the ALJ discounted Arakas's subjective complaints of pain and fatigue due to fibromyalgia, and specifically found that these complaints were "not reliable" and "not completely consistent with the objective evidence." Id. In reversing the ALJ's decision, the Fourth Circuit held that the ALJ erred in placing "undue emphasis on Arakas's normal clinical and laboratory results" in evaluating the degree to which the claimant's subjective complaints should be credited in the face of a severe medically determinable impairment of fibromyalgia. Id. at 97. The Fourth Circuit also held that the ALJ had wrongly discounted the treating physician opinions and mischaracterized evidence about Arakas's activities in discounting her subjective complaints.  In sum, the Fourth Circuit held that "[w]e simply cannot uphold a decision plagued by so many errors." Id. at 111.

This case is distinguishable from Arakas. Although Arakas had a co-existing physical impairment of degenerative disc disease, the Arakas Court focused on that ALJ's approach to fibromyalgia, an impairment that does not lend itself to objective findings. On the other hand, here, this ALJ addressed Claimant's impairments (osteoarthritis of the left foot with fibrosis and plantar fasciitis, history of stress fracture, and obesity), all

of which are physical impairments readily supportable by objective medical evidence Tr. 18 . Further, no error exists with respect to any inconsistencies the ALJ found between Claimant's subjective complaints and her activities. In contrast, the Arakas court criticized the ALJ for misstatements regarding the claimant's daily activities, cataloguing what it believed was a long litany of factual errors in the ALJ decision, and finding that the ALJ "misstated or mischaracterized. . . material facts." 983 F.3d at 99-101. The Arakas court acknowledged that an ALJ may consider daily activities, but the ALJ must do so in a manner that is faithful to the record. Id. at 111.

Here, unlike the ALJ in Arakas, the ALJ in this matter accurately summarized the record evidence, which supports his findings—and expressly considered "other evidence.". Id. at 98-100.  For instance, the ALJ properly summarized and accounted for Claimant's daily activities, which reflected that Claimant was able to care for herself and connect with friends and family members socially and by phone, go to the store and run errands on her own, and dine out in public Tr. 20-21 . The ALJ plainly relied on this evidence as one factor among many in his well-supported written decision--not like the ALJ in Arakas, who mischaracterized material facts. Id. at 98-100.

Additionally, Claimant's reliance on Dowling v. Comm'r of Soc. Sec., 986 F3d 377, 387 (4th Cir. 2021), is inapposite because the ALJ did comply with 20 C.F.R. § 404.1545 and SSR 96-8p when formulating the RFC. In Dowling, the court found error after the ALJ performed a continuing disability review ("CDR"), utilizing an eight-step process, and the ALJ did not cite to 20 C.F.R. § 404.1545 (which deals with residual functional capacity) anywhere throughout the entirety of the decision. Id. at 387. The court found further error because the ALJ in Dowling did not cite to SSR 96-8p, the ruling that provides guidance on how to properly evaluate the RFC, anywhere throughout the entire

decision. Id. Here, by contrast, this ALJ recognized his requirement to determine Claimant's "ability to do physical and mental work activities on a sustained basis despite limitations from her impairments" Tr. 17 . This ALJ stated "[i]n making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e), 404.1545; SSR 96-8p)" Tr. 17). Thus, unlike Dowling, this ALJ cited to 20 C.F.R. § 404.1545 and SSR 96-8p Tr. 17). And unlike Dowling, this ALJ considered Claimant's subjective complaints under the two-step test for symptom evaluation Tr. 24-28).

The ALJ then "went beyond his findings relating to Claimant's subjective complaints when assessing [Claimant's] RFC" by considering the testimony of Dr. Amusa at the hearing and the findings of two state agency medical consultants; the objective medical findings, which were often unremarkable and normal; and Claimant's improvement with conservative treatment, all of which were inconsistent with work-preclusive limitations.  Key v. Kijakazi, Civ. No. 20-552, 2021 WL 3887616, at *7 (M.D.N.C. Aug. 31, 2021), R&R adopted, Doc. 18 (Sept. 24, 2021) (distinguishing Dowling because the ALJ "went beyond his findings relating to Claimant's subjective complaints when assessing her RFC," specifically where the ALJ relied on the state agency consultant's finding in assessing the plaintiff's RFC  See Tr. 24-26 . The ALJ, thus, did not treat the RFC and symptom evaluation as "one and the same," contrary to Dowling. Ultimately, as the ALJ explained, he found that "all of [Claimant's] impairments were considered in conjunction with one another as well as [her] obesity and non-severe impairments in formulating" the RFC Tr. 28 . We take him at his word. See Reid v. Comm'r of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014) (where the ALJ states that he has

carefully considered the entire record, "absent evidence to the contrary," a reviewing court should "take [him] at [his] word").

Claimant's final argument is that the ALJ did not fully consider the 20 C.F.R.§ 404.1529(c) factors. However, the ALJ's decision expressly stated that the ALJ had "considered all symptoms . . . based on the requirements of 20 CFR 404.1529[.]" Tr. 24. When reading the ALJ's decision as a whole, he supported this statement with specific examples.  Keene v. Berryhill, 732 F. App'x 174, 177 (4th Cir. 2018) (finding the court "must read the ALJ's decision as a whole" and that findings in a step can support findings in other steps of the analysis). In assessing the RFC, the ALJ acknowledged Claimant's self-reports; specifically, that she alleged multiple impairments and associated limitations; Claimant testified that she had "shooting pain" in her left foot and had to use a walker if walking 20 minutes; she reported that she had received acupuncture and ultrasonic treatments for the fibroid tumors on her feet; and she stated she had migraine headaches two to three times per week, which usually lasted two hours Tr. 25, 51-53 .

The ALJ also considered Claimant's medication, treatment, and other measures. For instance, the ALJ noted that Claimant underwent resection of three left foot plantar fibromas from the bottom of her left foot; and subsequently underwent physical therapy Tr. 25, 314, 356-57 . The ALJ considered that Claimant was later treated with a cam boot, and that in October 2019, her pain was "much better" Tr. 25, 440 . The ALJ noted that in April 2020, Claimant was prescribed a rolling walker Tr. 25, 419 . And, for example, the ALJ considered that Claimant had bilateral pes planus and nodules over the right plantar foot, but she denied any pain with range of motion testing of the lower extremities, muscle strength was normal at 5/5 bilaterally in the upper and lower extremities, and there was no evidence of atrophy Tr. 28, 538-39 .

Further, the ALJ considered Claimant's work history during the hearing Tr. 56-57 . And the ALJ referenced Claimant's work history in the decision by noting her insured status (which is based on earnings) through December 31, 2023, Tr. 17  and making a past relevant work finding at step four of the sequential evaluation Tr. 28 . See Lovett v. Comm'r of Soc. Sec. Admin., No. 5:21-CV-00038-WCM, 2022 WL 4007274, at *4 (W.D.N.C. Sept. 1, 2022) ("An ALJ's failure to discuss a plaintiff's work history specifically as part of a 'credibility' analysis does not require remand when the ALJ relies on other permissible factors."); Pope v. Colvin, Civ. No. 2:15-cv-00001, 2016 WL 1211807, at *12, report and recommendation adopted, 2016 WL 1226972 (W.D. Va. Mar. 28, 2016) (explaining ALJ's failure to explicitly address the correlation between Pope's work history and her credibility was not reversible error when the ALJ personally developed the evidence of such with both Pope and the vocational expert during the hearing."). Thus, a reader can reasonably discern here that Claimant's work history was adequately considered by the ALJ. See Keene, 732 F. App'x at 177 ("We must read the ALJ's decision as a whole.").

Ultimately, Claimant asks this Court to do exactly what the law forbids: reweigh the evidence and substitute the Court's judgment for that of the ALJ. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005); Monsour, 806 F.2d at 1190. To the contrary, if substantial evidence supports the Commissioner's decision, the court must affirm it, 42 U.S.C. § 405(g), even if the reviewing court would have decided the case differently. Id. at 1190-91. Thus, although Claimant may disagree with the ALJ's final assessment, that does not mean that the ALJ's decision was erroneous or that Claimant can ask this Court to reweigh the evidence to arrive at a different conclusion.  Because substantial evidence supports the ALJ's assessment of the evidence, and the record contained ample evidence

from which the ALJ could render her determination, the undersigned FINDS the ALJ's decision is supported by substantial evidence, and Claimant failed to demonstrate reversible error.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 10), **GRANT** the Commissioner's request to affirm his decision (ECF No. 13), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable Frank W. Volk, United States District Judge. Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Volk.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); see Thomas v. Arn, 474 U.S. 140, 155 (1985); Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER:     March 1, 2024

Dwane L. Tinsley
United States Magistrate Judge